STATE OF NORTH CAROLINA v. CARL LYNN WILLIAMS

No. 137A92

(Filed 4 June 1993)

**1. Evidence and Witnesses § 1088 (NCI4th) — murder — incriminating statement in defendant's presence — silence — admissible**

The trial court did not err in a murder prosecution by admitting into evidence testimony that a statement had been made out of court in defendant's presence that defendant had participated in the shooting and defendant did not respond until some minutes later. The statement was properly admitted as an implied admission, and the trial court's instructions properly left to the jury the question of whether defendant's disavowal was a responsive denial or the product of self-serving cogitation.

**Am Jur 2d, Evidence § 638.**

**2. Criminal Law § 560 (NCI4th) — murder — out-of-court statement admitted — mistrial denied**

There was no error in denying a motion for a mistrial in a murder prosecution where the out-of-court statement on which the motion was based was properly admitted.

**Am Jur 2d, Trial § 1955.**

**3. Appeal and Error § 504 (NCI4th) — murder — failure to instruct on lesser included offense — invited error**

The trial court did not err in a murder prosecution by failing to instruct on the lesser included offense of second-degree murder where defendant foreclosed any inclination of the trial court to instruct on second degree murder.

**Am Jur 2d, Appeal and Error §§ 776, 778, 810.**

**4. Criminal Law § 794 (NCI4th) — murder — instructions — acting in concert — evidence sufficient**

The evidence in a murder prosecution supported an instruction on acting in concert where defendant's admission that, at the least, he knew that another man intended to shoot one of the victims and that he directed this other man to the location of the pistol is ample evidence of active encouragement and assistance to the perpetrator, as was his questioning

STATE v. WILLIAMS

[333 N.C. 719 (1993)]

of the other man's decision not to kill a witness. That witness's testimony that she saw defendant holding a small handgun as he and the other man left the house after the shootings corroborates evidence of defendant's presence and active participation in the shootings.

**Am Jur 2d, Trial §§ 1077, 1228, 1281.**

**5. Homicide § 258 (NCI4th) — murder — instructions — intentional use of deadly weapon — instruction given substantially as requested**

The trial court did not err in a murder prosecution in not giving the instruction on intentional use of a deadly weapon as defendant requested where the substance of the requested instruction, absent reference to the "sufficiency" of facts and inferences to sustain proof of premeditation and deliberation, was given more clearly by the trial court in instructions that kept inferences from the use of a deadly weapon separate from instructions regarding premeditation and deliberation. The trial court is not required to give requested instructions verbatim, even when they correctly state the law.

**Am Jur 2d, Trial §§ 1092, 1094, 1098.**

**6. Criminal Law § 823 (NCI4th) — murder — instructions — credibility of law enforcement officers — requested instruction denied**

The trial court did not err in a murder prosecution by refusing to give an instruction on the credibility of law enforcement officers. The trial court properly instructed the jury about witness credibility in general, focusing neither on law enforcement officers nor on any other class of witnesses. To have singled out any one class of witnesses might well have prompted the jury to be more critical of its credibility than that of other witnesses.

**Am Jur 2d, Trial §§ 1092, 1093, 1094.**

Justice PARKER did not participate in the consideration or decision of this case.

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing two consecutive terms of life imprisonment entered by Gore, J., at the 25 September 1991 Criminal Session of Superior

STATE v. WILLIAMS

[333 N.C. 719 (1993)]

Court, Cumberland County, on jury verdicts finding defendant guilty of first-degree murder. Heard in the Supreme Court 7 October 1992.

*Lacy H. Thornburg, Attorney General, by Ellen B. Scouten, Assistant Attorney General, for the State.*

*James R. Parish for defendant-appellant.*

WHICHARD, Justice.

A jury found defendant guilty of murder in the first degree on the basis of premeditation and deliberation in the deaths of William Fowler and Mitchell McNeill. From our review of the record and of defendant's assignments of error, we conclude that defendant received a fair trial free from prejudicial error.

The evidence, viewed in the light most favorable to the State, tended to show that defendant and his friend David Beal went to a pool hall Saturday evening, 19 May 1990. There they met defendant's cousin Lee Carver and a man named William Fowler, whom Beal agreed to drive home in exchange for ten or fifteen dollars. Beal, accompanied by defendant, Fowler, and Mattie Robeson, who was with Fowler, drove to Fowler's sister's house. Carver followed in his own car. Around fifteen minutes after their arrival, Mitchell McNeill arrived.

Shortly afterwards an altercation arose between a neighbor and Fowler and McNeill. When calm was restored, everyone except the neighbor went back inside and talked. Beal asked McNeill to get Fowler to pay for his ride, but Fowler had gone to sleep. McNeill said he would give Beal the money when he got paid. Defendant and Beal then left the house.

Outside, Beal stated he had not been paid, and defendant responded, "Well, they ain't paid you your money, looks like we will have to put a cap in them." To "cap" someone, Beal explained, meant to shoot him.

Mattie Robeson testified that McNeill went to the back bedroom to use the telephone, and Fowler went into another bedroom. Fowler went to answer the door, and defendant entered with Carver and Beal. Mattie went into the den to watch television. A few minutes later Fowler came to the den door and asked Mattie if she was getting sleepy. She said she was, and Fowler said Beal, Carver, and defendant were getting ready to leave "in a few minutes."

As soon as Fowler was out of the doorway, Mattie heard two gunshots. She shut the den door and hid in the closet. She then heard McNeill say twice, "Man, I didn't have nothing to do with it," and the sound of two more shots. When she stuck her head out the door she saw Beal, defendant, and Carver walking out the door. Defendant was carrying a little gun, and Carver was carrying a shotgun. When she heard cars driving away, she went to a neighbor's house and called the police.

An autopsy of Mitchell McNeill revealed that he died from a shot to the aorta. A second bullet grazed his hand and lodged in his abdomen. The forensic pathologist who performed the autopsy opined that the second shot was fired while McNeill was in a crouched or defensive position or that he was shot while falling. Fowler had also been shot twice—in the heart and in the back of the head. The bullets were recovered from the bodies and examined by an S.B.I. agent. The agent's written report, to which defendant and the State stipulated, stated that all four bullets had been fired from the same .32 caliber revolver. Officers found the revolver in a sofa at defendant's trailer two days after the murders.

The police questioned defendant on 21 May 1990. He gave a statement and responded to police questioning, first denying he was present when the victims were shot, then admitting he had been with Carver but stating that he had not fired any shots. Although Beal testified it was defendant who said he was going to "cap" the victims because Beal had not been paid, defendant attributed these remarks, like the killing itself, to Carver. Defendant admitted he had put the gun under the seat of Beal's car earlier in the evening and that he had told Carver its location.

Defendant's first four assignments of error concern the admissibility of a hearsay statement to which David Beal testified. Beal stated that Carver and defendant came to his home the day after the shooting. After *voir dire* Beal was permitted to restate Carver's remarks about the shooting made in defendant's presence. The testimony was as follows:

Q. Did you have a conversation with Mr. Carver and Mr. Williams outside?

A. Yes, sir.

**STATE v. WILLIAMS**

[333 N.C. 719 (1993)]

Q. What, if anything, was said about what happened the night before?

A. Well, that is when Lee had told me that both men had been shot.

Q. And, for the jury, identify who "Lee" is.

A. Mr. Carver.

Q. Tell them exactly what you recall him having said.

A. He had told me, both men had shot one, and one shot the other.[1]

Q. What, if anything, was said about where the men had been shot?

A. I think he told me one was shot in the chest and the head, and I think it was the side.

Q. Where was Mr. Williams while this was being said by Mr. Carver?

A. He was outside with me.

Q. How close together were the three of you?

A. Right beside each other.

Q. Was Mr. Williams right beside of you when Mr. Carver was saying that?

MR. PARISH: Objection to leading.

THE WITNESS: Yes, sir.

THE COURT: Sustained.

MR. COLYER: How far away, literally, how far away were the three of you from each other?

THE WITNESS: Maybe a foot at the most.

Q. Physically, where were you located?

A. Right beside my car, I believe.

---

1. Beal varied this statement somewhat on cross-examination, reiterating phrasing from a prior statement to police officers that "one shot one and one shot the other."

Q. What, if anything, did Carl Williams say when Lee Carver made that statement to you?

A. He didn't say nothing.

On cross-examination of Beal, defense counsel referred to one of Beal's pre-trial interviews in which Beal stated that defendant had told him he left before the shooting started, that he did not want any part of it, and that he walked away down the road. At defense counsel's request the trial court held a second *voir dire* examination of Beal to determine the proximity of these self-exculpatory statements to Carver's admission that "both men had shot one, and one shot the other." In the absence of the jury Beal testified that defendant's remarks occurred five to ten minutes after Carver's admission. The subject of the conversation had shifted away from the shooting, and Carver was talking about getting ready to leave. Defendant's explanation that he had had nothing to do with the shooting occurred "out of the clear blue," just before he and Carver left.

Before the jury was called in to hear the resumption of Beal's testimony, the trial court denied defendant's motion for a mistrial on the grounds that Carver's statement was the only evidence identifying defendant as a shooter. Beal then testified before the jury essentially as he had on *voir dire*. Following his testimony the trial court instructed the jury:

> Ladies and gentlemen, there has been evidence offered through the testimony of David Beal tending to show that at an earlier time, Mr. Beal made a statement or statements which may be consistent or may conflict with his testimony at this trial.

> You must not consider such earlier statements as evidence of the truth of what was said at that earlier time because it was not made under oath at this trial.

> If you find that such earlier statement or statements were made and that it or they are consistent or that it or they do conflict with the testimony of the witness at this trial, then you may consider this together with all other facts and circumstances bearing upon the witness's truthfulness in deciding whether you will believe or disbelieve Mr. Beal's testimony at this trial, and for no other purpose.

Ladies and gentlemen, there has been testimony from the witness, David Beal, that Lee Carver said, in the Defendant, Carl Williams', presence, "both of them shot both men," and "one shot one and one shot the other." And that Defendant Carl Williams did not say anything to rebut or deny these statements immediately after they were made, but remained silent during and after the time Lee Carver spoke them.

. . . .

[T]he Defendant, Carl Williams', silence may be considered as an adoption or ratification of Lee Carver's statement as an admission against penal interest.

There has also been testimony from the witness, David Beal, that five or ten minutes after the statements were made by Lee Carver, that the Defendant, Carl Williams, told David Beal, in Lee Carver's presence, that when Lee Carver said he was going to shoot them, he, the Defendant, Carl Williams, said, "I don't want no part of this," and left, walking up the road, and Lee came behind him in the Pinto and told him to hop in, and he did.

. . . .

Additionally, you may consider this statement if you find that it was made by the Defendant, Carl Williams, at the time David Beal said it was made, as a rebuttal or denial of the statements made by Lee Carver regarding the shooting of the two men, even though Lee Carver's statements were made five or ten minutes earlier.

It is for the jury to determine and say whether any or all of these statements were in fact made and whether they were made when the witness says they were. It is for the jury to say what force and effect these statements have if, in fact, you find that they have any force and effect at all.

. . . .

I instruct you that you, as the jury, are the sole finders of the facts. You, as the jury, are the sole judges of the credibility of each witness. You must decide for yourselves whether to believe the testimony of any witness. You may believe all or any part or none of what a witness has said on the stand.

**STATE v. WILLIAMS**

[333 N.C. 719 (1993)]

You are the sole judges of the weight to be given any evidence. By this, I mean, if you decide that certain evidence is believable, you must then determine the importance of that evidence in light of all other believable evidence in the case.

Defendant contends that the trial court erred, first, in permitting Beal to testify as to Carver's statement that both Carver and defendant shot the victims; second, in denying defendant's motion for mistrial on the grounds that there was no legal basis to admit the hearsay statement; third, in refusing to instruct the jury that it should disregard Beal's reiteration of Carver's statement; and fourth, in instructing the jury as it did when neither the facts nor the law supported a continuing conspiracy between Carver and defendant or defendant's admission by silence.

[1] Carver's statement that "both men had shot one, and one shot the other" was offered in evidence through Beal's testimony "to prove the truth of the matter asserted." As such, it was hearsay. N.C.G.S. § 8C-1, Rule 801(c) (1992). Rule 801(d)(B) permits an exception to the hearsay rule for admissions of a party, which include "a statement of which he has manifested his adoption or belief in its truth."

> Implied admissions are received with great caution. However, if the statement is made in a person's presence by a person having firsthand knowledge under such circumstances that a denial would be naturally expected if the statement were untrue and it is shown that he was in a position to hear and understand what was said and had the opportunity to speak, then his silence or failure to deny renders the statement admissible against him as an implied admission.

*State v. Spaulding*, 288 N.C. 397, 406, 219 S.E.2d 178, 183 (1975), *vacated on other grounds*, 428 U.S. 904, 49 L. Ed. 2d 1210 (1976). *See also* 2 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 179, p. 48 (3d ed. 1988).

Defendant contends his subsequent disavowal of any role in the shooting served to rebut or recant his admission by silence. We disagree. The trial court's instructions properly left to the jury the question whether disavowal was a responsive denial or the product of self-serving cogitation. We hold that Carver's statement was properly admitted as an implied admission, and that

the jury was properly instructed it could consider the statement on these grounds.[2]

[2] Defendant's contention that the trial court abused its discretion in denying defendant's motion for mistrial because it erroneously admitted Carver's statement also fails: a mistrial must be declared upon defendant's motion if there occurs during the trial an error that results in substantial and irreparable prejudice to the defendant's case. N.C.G.S. § 15A-1061 (1988). No such error occurred here, for the admissibility of Carver's statement was supported by the implied admission exception to the hearsay rule.

For the same reason the trial court did not err in refusing to instruct the jury that it should disregard Beal's reiteration of Carver's statement.

[3] Defendant's four remaining assignments of error concern the trial court's instructions to the jury. Defendant first contends that the trial court failed to instruct on the lesser-included offense of second-degree murder for each homicide. The record plainly reveals that any error in not instructing on the lesser-included offense was invited by defendant, who expressly requested that such an instruction not be given.

At the charge conference, defendant indicated unequivocally to the trial court that he did not wish for the jury to be instructed on second-degree murder:

THE COURT: Now, with regard to that, let me make inquiry, at this time, as to the parties' positions regarding lesser-included offenses. What says the Defense?

MR. PARISH: No, sir.

THE COURT: What says the State?

MR. COLYER: Judge, I have been giving some thought this afternoon to Second-degree, and quite frankly, I think the only

---

2. Although the trial court also supported its ruling with grounds other than the instruction on adoption or ratification by silence, it is not necessary to consider the propriety of those supplementary grounds here, as the instructions articulate a proper basis for the admissibility of Carver's statement. "The question for review is whether the ruling of the trial court was correct and not whether the reason given therefor is sound or tenable." *State v. Austin*, 320 N.C. 276, 290, 357 S.E.2d 641, 650, *cert. denied*, 484 U.S. 916, 98 L. Ed. 2d 224 (1987).

thing that supports that would be the statement that Lieutenant Oakes read that attributed to the Defendant with respect to knowing that . . . Mr. Carver had the gun and following him into the residence when the gun was used to shoot Mr. Fowler after heard [sic], according to Mr. Williams' statement, Mr. Carver say something about "capping them," and then saying, to him, that meant "to shoot them."

THE COURT: All right. Thank you. Do you want to respond to that?

MR. PARISH: No, sir. We don't want to respond.

THE COURT: All right. The Court, as to each victim, the Court will instruct only on First-degree Murder and will not submit a lesser-included offense of Second-degree Murder.

And for the record, as I understand it, that is the Defense's position on that; is that correct?

MR. PARISH: And not guilty. First-degree or not guilty.

THE COURT: Yes, sir, I was talking about lesser-included offenses.

A defendant is not prejudiced by error resulting from his own conduct. N.C.G.S. § 15A-1443(c) (1988). Here defendant foreclosed any inclination of the trial court to instruct on the lesser-included offense of second-degree murder. He is not entitled to any relief and will not be heard to complain on appeal. *State v. Patterson*, 332 N.C. 409, 415, 420 S.E.2d 98, 101 (1992).

**[4]** Second, defendant contends the trial court's instructions to the jury should not have included an instruction on acting in concert because the evidence presented no common plan or scheme. Defendant argues Beal's hearsay statement, rephrased on cross-examination, that "one shot one and one shot the other," shows independent, not concerted action, and he relies on his own statement that he entered the house behind Carver, who immediately began shooting.

The trial court instructed the jury as follows:

For a person to be guilty of a crime, ladies and gentlemen, it is not necessary that he himself do all of the acts necessary to constitute the crime. If two or more persons act together with a common purpose to commit murder, each of them is

held responsible for the acts of the others done in the commission of the murder.

However, the mere presence of the Defendant at the scene of the crime at the time it was committed does not make him guilty of the offense charged. This is so, even though he makes no effort to prevent the crime, if he is in sympathy with the criminal act, if he silently approves of the crime, or if he may secretly intend to assist the perpetrator in the commission of the crime in case his aid becomes necessary.

To find someone who does not actually participate in the commission of a crime guilty of the offense, there must be some evidence showing that he, by word or deed, gave active encouragement to the perpetrator of the crime, or by his conduct, made it known to the perpetrator that he was standing by to knowingly lend assistance to the accomplishment of the crime.

These instructions accurately mirror aspects of the acting in concert instruction this Court has approved in State v. Westbrook, 279 N.C. 18, 41-42, 181 S.E.2d 572, 586 (1971), death sentence vacated, 408 U.S. 939, 33 L. Ed. 2d 761 (1972).

Evidence in the record, particularly defendant's own statement, supports these instructions. In his statement defendant said he knew when he arrived at Fowler's house with Carver and Beal that Carver had a revolver. He heard Beal say if he was not paid his ten dollars he was going to "cap his ass," meaning, defendant said, "shoot him." Defendant said Beal left and he was with Carver when Carver shot both victims. In his statement defendant said he tried to dissuade Carver from shooting Fowler and McNeill, saying, "Come on, Lee, man, don't be doing no stupid junk like that." Yet Carver responded, "Going to cap this mawfucker. . . . Going to cap his ass," and shot "the big guy" in the hall. Defendant then said Carver told him he was going in the room to shoot "the little [guy]," and defendant heard two shots as he was walking out the door. Defendant then asked Carver why he did not shoot Mattie Robeson, saying, "You still got one left." Defendant asserted in his statement that the pistol had belonged to Carver, but defendant himself had put it under the seat of Beal's car to protect Carver from being cited for carrying a concealed weapon if they were stopped. Defendant said after all three men had exited Fowler's house, Carver, "disgusted" that Beal had

not been paid for the ride, said, "I'm [going to] bust a cap in him" and asked for the gun. Defendant then told Carver the gun was under the seat.

Defendant's admission that, at the very least, he knew Carver intended to shoot Fowler and that he directed Carver to the location of the pistol is ample evidence of active encouragement and assistance to the perpetrator, as was his questioning Carver's decision not to kill Mattie Robeson, too. Mattie Robeson's testimony that she saw defendant holding a small handgun as he and Carver left the house after the shootings corroborates evidence of defendant's presence and active participation in the shootings.

We conclude the evidence was sufficient to support the trial court's instructions on acting in concert.

[5] Third, defendant argues the trial court erred in failing to give the jury the following requested instruction:

As I have instructed you, members of the jury, in order to convict the DEFENDANT of premeditated and deliberated murder, the jury must find, beyond a reasonable doubt, that the DEFENDANT not only intended the killing, but that he formed that intent after premeditation and deliberation. However, in this regard, I caution you, members of the jury, that while the intentional use of a deadly weapon may, in and of itself, give rise to an inference that the killing was malicious, this fact alone is insufficient to sustain a finding of premeditation and deliberation.

In *State v. Thompson*, 328 N.C. 477, 402 S.E.2d 386 (1991), this Court held the trial court did not err in refusing to give the second sentence of this proposed instruction because the language, extracted from *State v. Zuniga*, 320 N.C. 233, 258, 357 S.E.2d 898, 914, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987), was inappropriate for a jury instruction: "It is confusing and not helpful to instruct a jury in terms of what an appellate court will consider sufficient to sustain a jury finding." *Thompson*, 328 N.C. at 490-91, 402 S.E.2d at 393.

The substance of these instructions, absent reference to "sufficiency" of facts and inferences to sustain proof of premeditation and deliberation, was given more clearly by the trial court in instructions that kept inferences from the use of a deadly weapon separate from instructions regarding premeditation and delibera-

tion. With regard to inferences that may be drawn from the intentional use of a deadly weapon the trial court instructed:

> If the State proves, beyond a reasonable doubt, that the defendant killed the victim with a deadly weapon, or intentionally inflicted a wound upon the victim with a deadly weapon, that proximately caused the victim's death, you may infer, first, that the killing was unlawful, and second, that it was done with malice, but you're not compelled to do so. You may consider that along with all other facts and circumstances in determining whether the killing was unlawful and whether it was done with malice.

The trial court instructed on the definition of premeditation and deliberation separately:

> [T]he State must prove that the Defendant acted with premeditation, that is, that he formed the intent to kill the victim over some period of time, however short, before he acted.
>
> And . . . the State must prove that the Defendant acted with deliberation, which means that he acted while he was in a cool state of mind.

We hold that the trial court complied in substance with defendant's request, properly separating the issue of inferences to be drawn from the use of a deadly weapon from a potentially confusing link to proof of premeditation and deliberation. The trial court is not required to give requested instructions verbatim, even when they correctly state the law. *State v. Groves*, 324 N.C. 360, 373, 378 S.E.2d 763, 771 (1989). When the trial court gives substantially the same instructions as those requested, particularly, as here, where they are purged of irrelevant and confusing features, the court does not err in refusing to give defendant's instructions exactly as proposed. *See State v. Monk*, 291 N.C. 37, 54, 229 S.E.2d 163, 174 (1976).

[6] Finally, defendant complains that the trial court erred in refusing to give the following instruction on the credibility of law enforcement officers:

> You have heard the testimony of law enforcement officials. The fact that a witness may be employed by the federal or state government as a law enforcement official does not mean that his testimony is necessarily deserving of more or less

consideration or greater or lesser weight than tha[t] of an ordinary witness.

At the same time, it is quite legitimate for defense counsel to try to attack the credibility of a law enforcement witness on the grounds that his testimony may be colored by a personal or professional interest in the outcome of the case.

It is your decision, after reviewing all the evidence, whether to accept the testimony of the law enforcement witness and to give to that testimony whatever weight, if any, you find it deserves.

Defendant cites *Bush v. United States,* 375 F.2d 602 (D.C. Cir. 1967) as authority for the correctness and appropriateness of this requested instruction. To the contrary, in *Bush* the D.C. Circuit refused to adopt a rule requiring a jury instruction "that the uncorroborated testimony of police narcotics officers must be viewed with suspicion and acted upon with caution." *Id.* at 603. To this suggestion the court responded:

The law has recognized that some witnesses, the accomplice and informant, for example, should in some circumstances be the subject of a cautionary instruction when requested. But it would be a dismal reflection on society to say that when the guardians of its security are called to testify in court under oath, their testimony must be viewed with suspicion. This would be tantamount to saying that police officers are inherently untrustworthy. The cure for unreliable police officers is not to be found in such a shotgun approach.

*Id.* at 604 (footnotes omitted).

We concur with this reasoning, and hold that the trial court properly instructed the jury about witness credibility in general, focusing neither on law enforcement officers nor on any other class of witnesses. To have singled out any one class of witnesses might well have prompted the jury to be more critical of its credibility than that of other witnesses. Indeed, this was the trial court's intention in giving special instructions regarding the testimony of David Beal, which the court cautioned was pursuant to a plea agreement. The trial court also gave special instructions regarding Mattie Robeson's testimony, charging the jury to be particularly attentive to her capacity and her opportunity for observation, and her emotional and physical condition at the time of the observation.

Special instructions concerning potentially interested witnesses are proper, *e.g., State v. Vance*, 277 N.C. 345, 346, 177 S.E.2d 389, 390 (1970), but they are inappropriate when, as here, there is nothing in the record to cast doubt upon the truthfulness and objectivity of the witness.

We conclude that defendant's assignments of error are meritless, and that he received a fair trial, free from prejudicial error.

NO ERROR.

Justice PARKER did not participate in the consideration or decision of this case.