STATE OF NORTH CAROLINA v. BOBBY LEE HARRIS

No. 345A92

(Filed 3 November 1994)

**1. Evidence and Witnesses § 1255 (NCI4th)— assertion of right to counsel—further communication initiated by defendant—subsequent confession admissible**

Defendant initiated further communication with the sheriff after he had earlier asserted his right to counsel, and his confession to the sheriff was admissible in this capital trial, where the sheriff allowed defendant's brother to visit defendant in jail; defendant's brother then went to the sheriff's office and told the sheriff that defendant wanted to talk with him; the sheriff had defendant brought to his office; the sheriff began the conference by asking defendant whether he wanted to talk with him in regard

to what had happened; and defendant answered that he wanted to do so.

**Am Jur 2d, Criminal Law §§ 788 et seq.; Evidence §§ 749 et seq.**

**Duty to advise accused as to right to assistance of counsel. 3 ALR2d 1003.**

**What constitutes assertion of right to counsel following Miranda warnings—state cases. 83 ALR4th 443.**

2. **Evidence and Witnesses § 1248 (NCI4th)— Miranda warnings—assertion of right to counsel—further communication initiated by defendant—additional warnings unnecessary**

   Where defendant had been properly advised of his *Miranda* rights and had asserted his right to counsel approximately twelve hours before he initiated communications with the sheriff, the sheriff was not required to again advise defendant of his *Miranda* rights before interrogating him, and defendant's subsequent confession to the sheriff was not inadmissible because the sheriff failed to advise defendant that if he decided to answer questions he could stop at any time and failed to ask defendant if he wanted a lawyer at that time.

   **Am Jur 2d, Criminal Law §§ 788 et seq.; Evidence §§ 749 et seq.**

   **Duty to advise accused as to right to assistance of counsel. 3 ALR2d 1003.**

   **What constitutes assertion of right to counsel following Miranda warnings—state cases. 83 ALR4th 443.**

3. **Criminal Law § 434 (NCI4th)— closing argument—prosecutor's statement about defendant's probation—supporting evidence**

   The district attorney's jury argument in a robbery-murder case that defendant was already on probation for another crime, that he knew what he was doing, and that "[w]e don't have a person who [has] never been in trouble" was supported by substantive evidence and was not improper where defendant stated in his recorded confession, which was played for the jury, that he was afraid that his probation would be revoked and he needed money

to leave town, and this evidence showed defendant's motive to rob and murder the victim.

**Am Jur 2d, Trial § 626.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

4. **Criminal Law § 951 (NCI4th)— ineffective assistance of counsel—motion for appropriate relief—determination without hearing**

The trial judge did not err by failing to conduct a hearing on defendant's motion for appropriate relief at the end of the guilt phase of a capital trial on the ground that he had ineffective assistance of counsel where the motion contained a general allegation that, because counsel had bone marrow cancer and was in pain, he did not conduct meaningful meetings with defendant or his co-counsel and that the case went to trial without adequate preparation; the only specific allegations as to ineffective assistance of counsel because of this lack of preparation concerned counsel's motion to suppress a part of defendant's confession and his delivery of a psychologist's report to the district attorney; the trial judge was able to determine the effect of these two matters without an evidentiary hearing; and the trial judge found (1) that a part of defendant's confession was irrelevant to the guilt phase of the trial and defendant was not prejudiced by its exclusion, and (2) that there was no evidence that the district attorney used the report in any way and defendant was not prejudiced by the delivery of the report to him.

**Am Jur 2d, Coram Nobis and Allied Statutory Remedies § 59.**

**Modern status of rules and standards in state courts as to adequacy of defense counsel's representation of criminal client. 2 ALR4th 27.**

**Adequacy of defense counsel's representation of criminal client regarding confessions and related matters. 7 ALR4th 180.**

**5. Criminal Law § 1315 (NCI4th)— capital sentencing—question about defendant's refusal to work—favorable answer—defendant not prejudiced**

The trial court in a capital sentencing hearing did not err by permitting the State to ask defendant's brother on cross-examination, "Your brother just won't work, will he?" where the witness answered that he would say defendant is sick, this testimony was not unfavorable to defendant, and the question added little to testimony already elicited as to defendant's character.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**6. Criminal Law § 370 (NCI4th)— capital sentencing—court's inquiries about relevancy of evidence—no expression of opinion**

The trial court did not intimate to the jury that the testimony of defendant's mother was not relevant in a capital sentencing hearing when he twice interrupted during her extensive testimony to inquire about the relevancy of her testimony concerning the day she decided to leave her first husband and testimony concerning birth defects of a daughter born during her second marriage where the court, upon being assured by defense counsel that the evidence had relevance, permitted those lines of testimony to continue without further comment. N.C.G.S. § 8C-1, Rule 611(a)(2).

**Am Jur 2d, Trial §§ 276 et seq.**

**7. Criminal Law § 439 (NCI4th)— capital sentencing—opinion on credibility of witness—no gross impropriety**

The prosecutor stated his opinion as to the credibility of a witness in violation of N.C.G.S. § 15A-1230 when he argued to the jury in a capital sentencing hearing that "I'm sure [defendant's mother] has tried to color this as best she can in the light that is most favorable to [defendant]" and that "I'm not certain that all of these things she has testified about happened exactly the way she said they did." However, the prosecutor could properly argue that it is a matter of common knowledge that a mother will likely shade her testimony favorably for her son, and the error of stating this argument in the form of an opinion was *de minimis* and did not require the trial court to intervene *ex mero motu*.

**Am Jur 2d, Trial §§ 692 et seq.**

STATE v. HARRIS

[338 N.C. 129 (1994)]

Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.

**8. Criminal Law § 452 (NCI4th)— capital sentencing—jury argument—failure to offer certain mitigating evidence**

The prosecutor's jury argument in a capital sentencing hearing that defendant had not offered any evidence from previous employers or former teachers which would show that he was a good worker or a good student did not involve facts not in evidence but was a proper comment on the failure of defendant to offer evidence which might have mitigated his punishment. The prosecutor's comment on the fact that defendant was not mentally retarded was also a proper comment on a lack of evidence which might have mitigated defendant's punishment.

Am Jur 2d, Trial §§ 590 et seq.

Adverse presumption or inference based on party's failure to produce or examine witness with employment relationship to party—modern cases. 80 ALR4th 405.

Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.

**9. Criminal Law § 454 (NCI4th)— capital sentencing—jury argument—life sentence like slap on wrist**

It was not error for the prosecutor to argue in a capital sentencing hearing that a life sentence was like a "slap on the wrist" or a "pat on the back," since the effect of the argument was that life imprisonment was not a severe enough punishment for the crime defendant had committed.

Am Jur 2d, Trial §§ 572 et seq.

Supreme Court's views as to what courtoom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.

**10. Criminal Law § 452 (NCI4th)— capital sentencing—jury argument—mitigating circumstances limited only by imagination—no gross impropriety**

While the prosecutor may have overstepped the bounds of what defendant could prove for mitigating circumstances in a capital sentencing hearing when he argued that he was limited in the circumstances he could submit justifying imposition of the death penalty but that there was no limit except that of their own imagination as to what defendant's attorneys could submit in mitigation of his punishment, this argument was not so grossly improper as to violate due process.

**Am Jur 2d, Trial §§ 554 et seq.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

**11. Criminal Law § 441 (NCI4th)— capital sentencing—jury argument—basis for expert opinion—inaccurate comment—no gross impropriety**

The prosecutor's jury argument in a capital sentencing hearing that all a forensic psychiatrist who was an expert in addiction medicine knew about defendant was what defendant had told him, although not completely accurate as to the basis of the psychiatrist's diagnosis, was not so grossly improper as to require a new trial.

**Am Jur 2d, Trial § 695.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

**12. Criminal Law § 1337 (NCI4th)— capital sentencing—aggravating circumstance—conviction of felony involving violence—ambiguous instruction—no plain error**

The trial court's instruction in a capital sentencing hearing that the jury should find the aggravating circumstance that defendant had previously been convicted for a felony involving violence if it found beyond a reasonable doubt "that on or about

the alleged date the defendant had been convicted of robbery and that the defendant killed the victim after he committed robbery" did not permit the jury to find this aggravating circumstance based on the robbery that occurred in conjunction with the murder for which defendant was on trial and was not plain error in light of the court's instruction in the previous sentence that defendant's conviction must have been based on conduct that occurred before the events out of which the murder arose.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other violent offense, had history of violent conduct, posed continuing threat to society, and the like—post-*Gregg* cases. 65 ALR4th 838.**

13. **Criminal Law § 1361 (NCI4th)— impaired capacity mitigating circumstance—instructions requiring finding of alcoholism and intoxication**

The trial court did not err by requiring the jury to find both that defendant was suffering from the disease of alcoholism and that he was intoxicated in order to find the impaired capacity mitigating circumstance since (1) defendant's attorney agreed at the charge conference that the court would so charge, and any error in the charge was invited error, and (2) defendant's expert witness testified that a "clear history of alcoholism and active drinking right up to the period of the offense in question" caused defendant to act as he did, and there was no evidence that either the disease or defendant's intoxication alone would support the finding of this circumstance.

**Am Jur 2d, Criminal Law §§ 598, 599.**

14. **Criminal Law § 1323 (NCI4th)— capital sentencing—nonstatutory mitigating circumstances—instructions—finding of mitigating value**

The trial court did not err by instructing the jury in a capital sentencing proceeding that it could consider nonstatutory mitigating circumstances which it found to have mitigating value.

**Am Jur 2d, Trial §§ 1441 et seq.**

**15. Criminal Law § 1325 (NCI4th)— capital sentencing— weighing aggravating and mitigating circumstances—use of "may" in instruction**

The trial court did not err by instructing the jury in a capital sentencing hearing that, in weighing the aggravating circumstances against the mitigating circumstances, each juror "may" consider any mitigating circumstance or circumstances that the juror determines to exist by a preponderance of the evidence.

**Am Jur 2d, Trial §§ 1441 et seq.**

**16. Criminal Law § 1373 (NCI4th)— first-degree murder— death penalty not disproportionate**

A sentence of death imposed upon defendant for first-degree murder was not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant, where defendant was convicted on the basis of both premeditation and deliberation and felony murder, the underlying felony being armed robbery; the jury found as aggravating circumstances that defendant had previously been convicted of a felony involving the use or threat of violence to the person and that the capital felony was committed for pecuniary gain; the jury found only one statutory and seven nonstatutory mitigating circumstances; and the evidence at trial tended to show: defendant and his accomplice worked for the victim as shrimpers; they planned to rob the victim to obtain funds and a vehicle to flee the state and avoid the consequences of other criminal activities; the victim, while on his boat, was stabbed by defendant three times in the back, robbed, and thrown overboard near the shore while he was still alive; the victim lay on a pile of oyster shells for several hours before he was found; the victim died on the operating table from loss of blood some five hours after being rescued; the wounds suffered by the victim need not have been fatal if he had received earlier treatment; and defendant failed to seek help for the victim afer leaving him in the water even though he had several chances to do so.

**Am Jur 2d, Criminal Law § 628.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other violent offense, had history of violent conduct, posed con-**

tinuing threat to society, and the like—post-*Gregg* cases. 65 ALR4th 838.

Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was committed for pecuniary gain, as consideration or in expectation of receiving something of monetary value, and the like—post-*Gregg* cases. 66 ALR4th 417.

Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.

Chief Justice Exum concurring in part and dissenting in part.

Justice Frye joins in this concurring and dissenting opinion.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Britt (Joe F.), J., at the 13 July 1992 Criminal Session of Superior Court, Onslow County, upon a jury verdict of guilty of first-degree murder, robbery with a dangerous weapon, second-degree burglary, larceny of a truck, and larceny of a firearm, during the 27 April 1992 Criminal Session of Superior Court, Onslow County, Strickland, J., presiding. The defendant's motion to bypass the Court of Appeals as to the non-capital cases was allowed 27 May 1993. Heard in the Supreme Court 15 March 1994.

The evidence at trial tended to show that the defendant, Bobby Lee Harris, and Joe Simpson were employed by the victim, John Redd, in his fishing business. For several days, the defendant and Simpson discussed the possibility of stealing the victim's truck and driving to Georgia. On the night of 20 August 1991, the three men went fishing around 11:00 p.m. According to the defendant's confession, the plan was for the defendant to restrain Redd while Simpson bound him. They were then going to rob him and leave him on the shore. The defendant, Simpson, and Redd had been drinking during the evening and for whatever reason (the defendant blamed Redd's "griping"), the defendant stabbed Redd with Redd's knife rather than merely restraining him. Redd was robbed of his wallet containing approximately $80.00 and of his keys, then was either thrown from the boat or placed on a pile of oyster shells. Shortly after dumping Redd, and as the defendant and Simpson were returning to the dock around 2:30 a.m., they were stopped by a game warden and cited for

traveling without running lights. After returning the boat to its dock, the defendant and Simpson took the victim's truck, drove to the victim's house, used the victim's keys and entered the house. They searched for and found the victim's .12-gauge shotgun and a .22 pistol, both of which they took. Taking some beer from the house, the two men left the house and drove to Georgia. The defendant and Simpson surrendered to Georgia authorities on 23 August 1991 after learning of Redd's death.

The victim was stabbed three times in the back. He was found on a pile of oyster shells along Bear's Inlet around 6:15 a.m. He was transported to the Naval Hospital at Camp Lejeune and died on the operating table around noon, but not before identifying the defendant and Simpson as his assailants. The cause of death was exsanguination, bleeding to death. The victim's blood alcohol level was the equivalent of .263 on the breathalyzer test.

*Michael F. Easley, Attorney General, by William B. Crumpler, Associate Attorney General, for the State.*

*Charles H. Henry and Charles K. Medlin, Jr., for defendant-appellant.*

WEBB, Justice.

[1] The defendant's first two assignments of error deal with the admissibility of a statement the defendant made to Sheriff Ed Brown. The defendant made a motion to suppress this statement and a hearing was held on this motion.

The evidence at this hearing showed that the defendant and Joe Simpson surrendered to the sheriff's department of Haralson County, Georgia. Lt. Mack Whitney of the Onslow County Sheriff's Department and three other law enforcement officers went to Haralson County, Georgia, to return the two men to North Carolina. On the morning of 27 August 1991, Lt. Whitney met the defendant at the Haralson County Jail. Lt. Whitney fully advised the defendant of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966). The defendant said he wanted an attorney and no interrogation of the defendant was had at that time. The defendant signed a form acknowledging that he had been fully advised of and understood his rights. The defendant volunteered the information that Mr. Redd's shotgun was at the home of Joe Simpson's grandmother with whom

the two men had been staying while they were in Georgia. Lt. Whitney retrieved the shotgun and returned it to North Carolina.

Lt. Whitney and an SBI agent brought the defendant and Joe Simpson back to Jacksonville and put them in the Onslow County Jail on the evening of 27 August 1991. During the evening, Sheriff Brown allowed the defendant's brother to visit the defendant. The defendant's brother then came to the sheriff's office and told the sheriff that the defendant wanted to talk to him.

The sheriff had the defendant brought to his office at approximately 11:20 p.m. on 27 August 1991. Those present in the office with the sheriff and the defendant were Lt. Whitney, the defendant's brother and his brother's wife. A cassette tape was used to record the conference. The sheriff began the conference by asking the defendant whether he wanted to come and talk to him in regard to what had happened and the defendant answered that he wanted to do so. The defendant started to make a statement and Sheriff Brown then interrupted him and again advised him of his rights under *Miranda* except he did not advise him that he could stop answering questions at any time. The sheriff also did not ask the defendant, "[d]o you want a lawyer now?" The defendant then made an incriminating statement.

The court made findings of fact consistent with the above evidence including a finding that Sheriff Brown did not encourage the defendant to speak to him. The court concluded that the defendant freely, understandingly, voluntarily, knowingly, and intelligently waived his *Miranda* rights and agreed to speak with Sheriff Brown without the presence of an attorney. The defendant's motion was overruled.

In *Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378 (1981), the United States Supreme Court held that once a defendant has requested counsel, law enforcement officers may not again interrogate him until he is provided with counsel unless he initiates further communication with the officers. The defendant says the evidence showed Sheriff Brown plainly initiated a custodial interrogation of him in violation of *Edwards*. He says that the totality of circumstances, including the involvement of a family member as well as removing him from the jail to the friendlier confines of the sheriff's office, coupled with the incomplete recital of the defendant's constitutional rights, could not overcome his earlier assertion of the right to counsel. We disagree. The evidence clearly showed and the court found that the defendant initiated further communication with the sheriff. The fact

that the defendant's brother carried the message to Sheriff Brown, that the defendant wanted to talk to him, does not mean the sheriff initiated the conversation. The answers the defendant gave to the sheriff as their conference began clearly show it was the defendant and not Sheriff Brown who initiated the conversation.

This assignment of error is overruled.

**[2]** In his second assignment of error, the defendant contends he was not adequately warned under *Miranda* because Sheriff Brown did not tell him that if he decided to answer any questions he could stop at any time and ask for a lawyer and the sheriff did not ask him if he wanted a lawyer at that time. The defendant acknowledges that approximately twelve hours earlier, Lt. Whitney had properly warned him of his *Miranda* rights in Haralson County, Georgia.

In *State v. McZorn*, 288 N.C. 417, 219 S.E.2d 201 (1975), *sentence vacated on other grounds*, 428 U.S. 904, 49 L. Ed. 2d 1210 (1976), we discussed the need to give an additional *Miranda* warning after a proper warning has been given. Chief Justice Sharp, writing for the Court, said,

> The consensus is that although *Miranda* warnings, once given, are not to be accorded "unlimited efficacy or perpetuity," where no inordinate time elapses between the interrogations, the subject matter of the questioning remains the same, and there is no evidence that in the interval between the two interrogations anything occurred to dilute the first warning, repetition of the warnings is not required.

*Id.* at 433, 219 S.E.2d at 212. The ultimate question is whether the defendant, with full knowledge of his legal rights, knowingly and intentionally relinquished them.

There is no reason to believe the defendant, having been fully and properly advised of his *Miranda* rights approximately twelve hours before his interview with Sheriff Brown, had forgotten them. Certainly he should have known of his right to an attorney before he could be interrogated by the officers for he had exercised his right on that day. It was not necessary for Sheriff Brown to advise the defendant again of his rights under *Miranda*.

This assignment of error is overruled.

**[3]** The defendant next assigns error to certain portions of the district attorney's argument to the jury, made over the objection of the

**STATE v. HARRIS**

[338 N.C. 129 (1994)]

defendant. The district attorney argued that the defendant was already on probation for another crime, that he knew what he was doing and, "[w]e don't have a person who [has] never been in any trouble." The defendant did not take the stand in this case and did not offer any evidence as to his own reputation and character.

The defendant, relying on *State v. Tucker*, 317 N.C. 532, 346 S.E.2d 417 (1986) and *State v. Miller*, 271 N.C. 646, 157 S.E.2d 335 (1967), says allowing the district attorney to argue as he did was error requiring a new trial. In *Tucker*, we ordered a new trial because the district attorney argued that testimony of former crimes, elicited only to impeach the defendant as a witness, should be considered substantive evidence for conviction. In *Miller*, we held it was prejudicial error in a trial for breaking or entering to imply that the defendants were habitual storebreakers when there was no evidence to support such an implication. The defendant says that by allowing the district attorney to make the argument he made in this case, the jury was inflamed to convict him for crimes for which he was not being tried.

The distinction between this case and *Tucker* and *Miller* is that in this case there was substantive evidence which supports the district attorney's argument. In his recorded statement to Sheriff Brown, which was played for the jury, the defendant said he was afraid his probation would be revoked and he needed money to leave town. This was evidence that the defendant had a motive to rob and murder Mr. Redd. The district attorney's argument was proper.

This assignment of error is overruled.

The defendant's next two assignments of error involve a motion for appropriate relief made by the defendant after the guilt phase of the trial, but before the sentencing hearing. Timothy E. Merritt and Charles K. Medlin were appointed to represent the defendant. While the jury was being selected, Mr. Medlin became aware that Mr. Merritt was ill and in pain. Mr. Medlin offered to take on more in-court responsibilities but Mr. Merritt declined, saying that the jury *voir dire* "kept his mind off the pain." During the seven days of jury selection, the court's schedule was interrupted three times to accommodate Mr. Merritt's need for medical treatment.

After the jury was seated, the trial proceeded without interruption. However, after the guilt phase was completed the sentencing phase was continued for eleven days because of the hospitalization of Mr. Merritt. The diagnosis at this time was bone marrow cancer and

the prognosis was terminal.[1] Mr. Merritt was relieved as counsel for the defendant and Charles H. Henry was appointed to replace him for the sentencing hearing, which was continued.

The defendant made a motion for appropriate relief prior to the sentencing hearing, contending that he had ineffective assistance of counsel because of the illness of Mr. Merritt. In the motion, which was sworn to by Mr. Medlin, Mr. Medlin said he believed the sickness and pain Mr. Merritt was suffering adversely affected his ability to conduct the trial. He said that on occasion, "Sunday sessions" were scheduled to discuss strategy and Mr. Merritt was late for them so that little strategy was discussed. Mr. Medlin said in the motion that Mr. Merritt, against his advice, made a motion *in limine* to suppress a part of the defendant's confession, which led the State to move to suppress other parts of the confession. Both motions were allowed, which excluded evidence of second-degree murder which might have led to a conviction of second-degree rather than first-degree murder.

Mr. Medlin also said in the motion that Mr. Merritt had procured a psychologist to evaluate the defendant. The psychologist's report referred to medical opinions which he was not qualified to give. Mr. Merritt gave a copy of the report to the district attorney without discussing the matter with Mr. Medlin. Mr. Medlin said the psychologist should not have been considered as a witness for the defendant and the report should not have been delivered to the district attorney.

Judge James R. Strickland, who presided at the guilt phase of the trial, denied the motion for appropriate relief. As to the allegation that Mr. Merritt should not have moved to suppress part of the defendant's confession, Judge Strickland found that the part of the confession that was suppressed would have been highly prejudicial to the defendant at the guilt phase of the trial. A part of the confession was irrelevant to the guilt phase of the trial and the defendant was not prejudiced by its exclusion. As to the giving of the psychologist's report to the district attorney, Judge Strickland found that there was no evidence that the district attorney used the report in any way and no prejudice to the defendant was shown by the delivery of the report to the district attorney.

Judge Strickland ruled that there was not a showing that Mr. Merritt's representation was deficient, or if it was that the defendant

---

1. Mr. Merritt died approximately nine months later as a result of the illness.

was prejudiced by it. He concluded that an evidentiary hearing was not necessary and denied the defendant's motion.

[4] The defendant first says it was error for the court not to conduct a hearing on his motion, particularly his allegations that Mr. Merritt failed to conduct meaningful meetings with co-counsel and the defendant to discuss trial preparation and that the case went to trial without adequate preparation.

The defendant made the motion for appropriate relief pursuant to N.C.G.S. § 15A-1414(b). In regard to a motion made under this section, N.C.G.S. § 15A-1420(c) provides:

(1) Any party is entitled to a hearing on questions of law or fact arising from the motion and any supporting or opposing information presented unless the court determines that the motion is without merit. The court must determine, on the basis of these materials and the requirements of this subsection, whether an evidentiary hearing is required to resolve questions of fact.

(2) An evidentiary hearing is not required when the motion is made in the trial court pursuant to G.S. § 15A-1414, but the court may hold an evidentiary hearing if it is appropriate to resolve questions of fact.

We cannot hold that the court committed error by not holding an evidentiary hearing. The motion contained a general allegation that because of his illness, Mr. Merritt did not conduct meaningful meetings with the defendant or his co-counsel and that the case went to trial without adequate preparation. The only specific allegations as to ineffective assistance of counsel because of this lack of preparation dealt with the motion to suppress a part of the defendant's confession and the delivery of the psychologist's report to the district attorney. Judge Strickland had conducted the trial and was able to determine the effect of these two matters without an evidentiary hearing. There were no specific contentions that required an evidentiary hearing to resolve questions of fact.

This assignment of error is overruled.

The defendant next assigns error to the court's failure to find he had ineffective assistance of counsel. He concedes there is no evidence in the record which would support such a finding because, he says, the court did not conduct an evidentiary hearing. He says he

made this assignment of error to preserve the issue. Although we overrule this assignment of error, we note that the defendant may make a motion for appropriate relief under N.C.G.S. § 15A-1415 and present any additional evidence he may have as to ineffective assistance of counsel.

[5] The defendant next assigns error to the overruling of his objection to a question asked his brother by the State on cross-examination during the sentencing hearing. The defendant's brother testified as to the defendant's criminal history, which was largely inter-related with his own. The defendant's brother testified further as to the defendant's addiction to crack cocaine, noting that on one occasion upon the release of the defendant from one treatment program, he returned to the brother's home and the brother's television set and other valuable possessions were soon missing. On cross-examination, the State elicited testimony, without objection, that the defendant had been fired from several jobs. The following colloquy then occurred:

[MR. ANDREWS:] In other words, he's just not going to work, is he, Mr. Harris? Your brother just won't work, will he?

. . . .

MR. HENRY: Objection, Your Honor.

THE COURT: Well, overruled if he knows. Do you know the answer to that, sir?

. . . .

[MR. HARRIS:] I would say he is sick. He needs a doctor.

The defendant contends that the only purpose of this question was to make the jury think the defendant is a shiftless person. Being a shiftless, lazy person, says the defendant, is not an aggravating circumstance under N.C.G.S. § 15A-2000, and it was error to let the State create such a circumstance by asking this question. *See State v. Brown*, 320 N.C. 179, 358 S.E.2d 1, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987).

The testimony elicited was certainly not unfavorable to the defendant. The witness in effect denied his brother was shiftless and lazy but said he was sick. The question added very little to the testimony that had been elicited as to the defendant's character.

This assignment of error is overruled.

STATE v. HARRIS

[338 N.C. 129 (1994)]

**[6]** The defendant next assigns error to two instances in which the court interrupted the defendant's counsel while he was examining a witness during the penalty hearing. He says these interruptions intimated to the jury that the testimony of the witness was not relevant, but because this is a capital case the jury would have to listen to it. The defendant says this is error. *See State v. Holden*, 280 N.C. 426, 185 S.E.2d 889 (1972); *State v. Woolard*, 227 N.C. 645, 44 S.E.2d 29 (1947).

The defendant called his mother, Mrs. Mode, as a witness at the sentencing hearing. The defendant's attorney opened his questioning by inquiring extensively about her first marriage. Other than referring to "the boys' " comprehension of problems in the marriage, the first eight transcript pages of Mrs. Mode's testimony fail to mention the defendant. The court's first intervention occurred after the following sequence of questions and answers:

Q.   Do you recall the day that you finally decided to leave David Harris, your husband, your first husband?

A.   Yes, I do.

Q.   What happened on that day?

A.   Well, he had—we had been arguing. He had been slapping me around that day. And on this particular occasion, I had gone to sit down on the living room couch and he had progressed with his meanness over the years and it had gotten worse and worse. But on this particular day, I had walked away from him and had wanted to sit down on the couch; and I had a television to my right and a full-length coffee table in front of me. And I was—

THE COURT: Mr. Medlin, I don't want to interrupt, but how is this relevant to the issues involved in this lawsuit[?]

MR. MEDLIN: Your Honor, I'll tie that up in just a second, if you will permit me.

THE COURT: All right, go ahead.

Counsel continued to ask questions permitting the witness to conclude the story of the break-up of the marriage and progressed on to the witness' second marriage. This marriage resulted in the birth of a handicapped daughter. The mother next testified extensively about the medical problems this child suffered. The second intervention by the court occurred as follows:

Q. What, if anything—tell me about Jennifer being born? What, if any, complications was she born with?

A. She is a multiple handicapped child. She has several birth defects.

Q. What are they?

A. She has a neurologic problem. It is called arachnoidea. It is the covering on the brain. Her brain is like chocolate on a cake and in some places for her it doesn't exist. And it has a lot of sensory nerves into it and it affected her memory, her balance, her ability to do anything.

Q. Any other birth defects she was born with?

A. Yes, she was born deaf.

Q. Completely deaf?

A. She has maybe 20, 25 percent hearing in her left ear, but it is not usable to her.

Q. Does she have some assistance with the hearing?

A. Yes, she does. She wears a hearing aid.

Q. What, if anything, was she born with?

A. She has a heart problem. She has a growth problem. She has a vision defect.

THE COURT: Again, Mr. Medlin, I assume this has some relevancy to the issues here?

MR. MEDLIN: Yes, sir, it has complete relevance to the issues here and it will become apparent in just a little while.

THE COURT: All right.

We note that in over fifty transcript pages of direct examination, these two brief questions were the only times the court spoke except in response to infrequent objections. In comparing the events to the controlling statute, we note that the trial court is charged with "exercis[ing] reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to . . . avoid needless consumption of time . . . ." N.C.G.S. § 8C-1, Rule 611(a)(2) (1992). Judge Britt did no more in either situation than ensure that defense counsel was not consuming the court's time with irrelevant material. Once assured

by counsel that the evidence had relevance, the court permitted the questioning to continue without further comment and expressed no opinion on the evidence. The court in no way abused its discretion nor approached the level of interference which would be error.

This assignment of error is overruled.

[7] The defendant next assigns error to several parts of the district attorney's argument to the jury. No objection was made to them at trial, but the defendant says the court should have intervened *ex mero motu* and stopped them with instructions to the jury to disregard those parts of the argument. If no objection is made, we will not order a new trial based on an improper jury argument unless it constitutes a gross impropriety which "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. McCollum*, 334 N.C. 208, 224, 433 S.E.2d 144, 152 (1993), *cert. denied*, ___ U.S. ___, 129 L. Ed. 2d 895, 62 U.S.L.W. 3871 (30 June 1994) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181, 91 L. Ed. 2d 144, 157 (1986)).

The defendant's mother and brother testified to the very bad conditions under which the defendant was reared. In his argument to the jury, the district attorney in an effort to counteract the mother's testimony said:

I'm sure that she has tried to color this as best she can in the light that is most favorable to Bobby Harris[.] I mean, a mother would do that.

I'm not certain that all of these things she has testified about happened exactly the way she said they did.

At a later time in his argument, the court *ex mero motu* corrected the district attorney when he expressed his opinion in his argument, but did not instruct the jury to disregard the argument.

We agree with the defendant that by stating his opinion as to the credibility of a witness, the district attorney violated N.C.G.S. § 15A-1230. *See State v. Riddle*, 311 N.C. 734, 319 S.E.2d 250 (1984). We cannot hold, however, that this argument was so grossly improper that it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. McCollum*, 334 N.C. 208, 224, 433 S.E.2d 144, 152 (quoting *Darden v. Wainwright*, 477 U.S. 168, 181, 91 L. Ed. 2d 144, 157). It is a matter of common knowledge that a mother will likely shade her testimony favorably for her son.

The district attorney could argue this to the jury and the error of stating it in the form of his opinion was *de minimis*. *State v. McHone*, 334 N.C. 627, 640, 435 S.E.2d 296, 304 (1993), *cert. denied*, ___ U.S. ___, 128 L. Ed. 2d 220 (1994).

**[8]** The defendant next contends under this assignment of error that the district attorney argued matters that were not in evidence. *State v. Britt*, 288 N.C. 699, 220 S.E.2d 283 (1975); *State v. Monk*, 286 N.C. 509, 212 S.E.2d 125 (1975); *State v. Smith*, 279 N.C. 163, 181 S.E.2d 458 (1971). The district attorney argued that the defendant had not offered any evidence from previous employers which would have shown he was a good worker, or from former teachers which would have shown he was a good student. The defendant says this was an attempt by the State to create a nonstatutory aggravating circumstance, the lack of an exemplary work and educational background. This argument by the district attorney did not involve facts that were not in evidence. It was a comment on the failure of the defendant to offer evidence which might have mitigated his punishment. This argument was proper. *State v. Reid*, 334 N.C. 551, 555, 434 S.E.2d 193, 196 (1993). Nor can we hold that it was error, as argued by the defendant, for the district attorney to comment on the fact that defendant was not mentally retarded. This again was a comment on a lack of evidence which might have mitigated the defendant's punishment.

**[9]** The defendant also contends it was error for the district attorney to argue that a life sentence was like a "slap on the wrist" or a "pat on the back." We note that the defendant's attorney argued the severe punishment involved in serving a life sentence. Both arguments were proper. The district attorney could argue that life in prison was not a severe enough punishment for the crime defendant had committed and this in effect was what he was arguing.

**[10]** The defendant next contends it was error for the district attorney to argue that he was limited in the circumstances which he could submit justifying the imposition of the death penalty, while there was no limit except that of their own imagination as to what the defendant's attorneys could submit in mitigation of his punishment. The defendant says only circumstances which may have mitigating value may be submitted to the jury and not any circumstances that may be the product of the defendant's imagination. *See State v. Irwin*, 304 N.C. 93, 104, 282 S.E.2d 439, 446 (1981).

The district attorney may have overstepped the bounds of what the defendant could prove for mitigating circumstances, but the argu-

ment was not so grossly improper that the conviction was a denial of due process.

[11] The defendant argues further, under this assignment of error, that the district attorney misstated the evidence in arguing about the testimony of Dr. Thomas W. Brown, a forensic psychiatrist and an expert in the field of addiction medicine. Dr. Brown testified about the defendant's disease of alcoholism and how it affected his mental functioning at the time of the killing. The doctor had interviewed the defendant and had examined his medical records from the Onslow County Mental Health Center and Walter B. Jones Alcohol and Drug Treatment Center. In his argument to the jury, the district attorney said that all the doctor knew about the defendant was what the defendant had told him. The district attorney's argument, although not completely accurate as to the basis of Dr. Brown's diagnosis, was not so grossly improper as to require a new trial.

This assignment of error is overruled.

[12] The defendant next assigns error to the following part of the charge during the sentencing hearing:

Members of the jury, robbery is by definition a felony involving the use or threat of violence to the person. A person has been previously convicted, if he has been convicted and not merely charged and if his conviction is based on conduct which occurred before the events out of which this murder arose.

If you find from the evidence beyond a reasonable doubt that on or about the alleged date the defendant had been convicted of robbery and that the defendant killed the victim after he committed robbery, you would find this aggravating circumstance . . . .

The defendant says that this instruction is erroneous because the first sentence of the second paragraph allowed the jury to find the aggravating circumstance that the defendant had previously been convicted of a felony involving the use or threat of violence to the person, based on the robbery that occurred in conjunction with the murder. The defendant did not object to the charge at the time it was given and he did not request additional instructions. We must review this assignment of error under the plain error rule. *State v. Gibbs*, 335 N.C. 1, 49, 436 S.E.2d 321, 349 (1993), *cert. denied*, ___ U.S. ___, 129 L. Ed. 2d ___, 62 U.S.L.W. 3861 (27 June 1994).

We note that the State and the defendant offered evidence of the defendant's conviction of robbery in Oklahoma prior to any of the events in this case. The district attorney argued the prior conviction to the jury as the basis for finding the aggravating circumstance. We do not believe the ambiguous language to which the defendant assigns error rises to the level of plain error, particularly in light of the instruction in the previous sentence that the defendant's conviction must have been based on conduct that occurred before the events out of which the murder for which he was being tried arose.

This assignment of error is overruled.

[13] The defendant next assigns error to a part of the charge in which the court said, "[y]ou would find this mitigating circumstance if you find that the defendant was suffering from the disease of alcoholism and was intoxicated at the time of this offense, and that this impaired his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." The defendant says it was error to require him to prove both the disease of alcoholism and that the defendant was intoxicated at the time of the crime in order to have the jury find this mitigating circumstance.

The first difficulty with this argument by the defendant is that the defendant, through his attorney, agreed at the charge conference that the court would charge on this feature of the case as it did. If there was error in the charge, it was invited error and we shall not review it. *State v. Williams*, 333 N.C. 719, 728, 430 S.E.2d 888, 893 (1993).

We note that there was no error in this part of the charge. Dr. Brown, the witness upon whom the defendant relied to establish this mitigating circumstance, testified that it was a "clear history of alcoholism and active drinking right up to the period of the offense in question," which caused the defendant to act as he did. We cannot find any evidence in the record that either the disease or the defendant's intoxication alone would support the finding of this mitigating circumstance. The court thus properly did not so charge the jury.

This assignment of error is overruled.

[14] The defendant next assigns error to a part of the charge in which the court instructed the jury that it could consider nonstatutory mitigating circumstances which it found to have mitigating value. He contends that when the court submits a mitigating circumstance to the jury, it must consider it. The defendant candidly admits that we have determined this issue contrary to his position in *State v. Hill*, 331 N.C.

387, 417, 417 S.E.2d 765, 780, *cert. denied,* ___ U.S. ___, 122 L. Ed. 2d 684, *reh'g denied,* ___ U.S. ___, 123 L. Ed. 2d 503 (1993); *State v. Huff,* 325 N.C. 1, 59, 381 S.E.2d 635, 669 (1989), *judgment vacated on other grounds,* 497 U.S. 1021, 111 L. Ed. 2d 777, *on remand,* 328 N.C. 532, 402 S.E.2d 577 (1990); and *State v. Fullwood,* 323 N.C. 371, 373 S.E.2d 518 (1988), *judgment vacated on other grounds,* 494 U.S. 1022, 108 L. Ed. 2d 602 (1990), *on remand,* 329 N.C. 233, 404 S.E.2d 842 (1991). He requests that we reconsider this question. We decline to do so. This assignment of error is overruled.

[15] The defendant next contends there is error in the following portion of the charge:

> If you find from the evidence one or more mitigating circumstances, you must weigh the aggravating circumstances against the mitigating circumstances. When deciding this issue, each juror may consider any mitigating circumstance or circumstances that the juror determines to exist by a preponderance of the evidence in issue two.

The defendant says that by the use of the word "may" in instructing the jury how to consider mitigating circumstances, the court told the jury that it did not have to consider the mitigating circumstances, which is error. We answered this question contrary to the defendant's position in *State v. Jones,* 336 N.C. 229, 443 S.E.2d 48 (1994) and *State v. Lee,* 335 N.C. 244, 439 S.E.2d 547 (1994). This assignment of error is overruled.

### PROPORTIONALITY REVIEW

[16] In reviewing the sentence, as we are required to do by N.C.G.S. § 15A-2000(d), *State v. Brown,* 320 N.C. 179, 358 S.E.2d 1; *State v. Williams,* 308 N.C. 47, 301 S.E.2d 335, *cert. denied,* 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied,* 464 U.S. 1004, 78 L. Ed. 2d 704 (1983), we have conducted a thorough review of the transcript, record on appeal, briefs, and oral arguments of counsel, and we conclude that the jury's finding of each aggravating circumstance was supported by the evidence. We further conclude that nothing in the record suggests that the jury sentenced the defendant to death while under the influence of passion, prejudice, or any other arbitrary factor.

Our final task is to determine whether the sentence was excessive or disproportionate to the penalties imposed in other first-degree murder cases. As we have noted in the past, there are cases where the "nature of the crime and the character of the defendant in every

instance distinguish [the] case in some way from others in the pool."
*State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34. We find this to be
one of those cases. As noted below, this defendant and this crime are
clearly distinguishable from those cases in the pool which resulted in
life sentences based either upon a jury recommendation of life or
upon a finding by this Court that the death sentence imposed was dis-
proportionate. The facts and circumstances in "death affirmed" cases
are similarly distinguishable. In a discussion of cases such as this and
of appellate courts' duties to conduct thorough proportionality
reviews, the United States Supreme Court stated:

> The primary concern in the Eighth Amendment context has
> been that the sentencing decision be based on the facts and cir-
> cumstances of the defendant, his background, and his crime. In
> scrutinizing death penalty procedures under the Eighth Amend-
> ment, the Court has emphasized the "twin objectives" of "mea-
> sured consistent application and fairness to the accused." . . . . It
> is a routine task of appellate courts to decide whether the evi-
> dence supports a jury verdict and in capital cases in "weighing"
> States, to consider whether the evidence is such that the sen-
> tencer could have arrived at the death sentence that was
> imposed. . . . [A] similar process of weighing aggravating and mit-
> igating evidence is involved in an appellate court's proportionali-
> ty review. Furthermore, this Court has repeatedly emphasized
> that meaningful appellate review of death sentences promotes
> reliability and consistency. It is also important to note that state
> supreme courts in States authorizing the death penalty may well
> review many death sentences and that typical jurors, in contrast,
> will serve on only one such case during their lifetimes.

*Clemons v. Mississippi*, 494 U.S. 738, 748-749, 108 L. Ed. 2d 725, 738-
39 (1990) (citations omitted).

    In determining proportionality, we are impressed with the cal-
lousness exhibited by the defendant in this case. The defendant
acknowledged that his purpose in carrying out the crime was to
obtain the wherewithal to flee other legal problems. The defendant
and his companion planned the robbery well in advance and the
defendant acknowledged that he carried a knife, though he indicated
that the plan did not entail his using the knife. The defendant evi-
denced a degree of cowardice in attacking the victim without warn-
ing and from behind, stabbing him three times in rapid succession.
*See State v. Greene*, 324 N.C. 1, 376 S.E.2d 430 (1989), *judgment*

*vacated on other grounds,* 494 U.S. 1022, 108 L. Ed. 2d 603, *on remand,* 329 N.C. 771, 408 S.E.2d 185 (1990). According to the defendant, he was aware that the victim was seriously wounded and he took steps to make the victim more comfortable before the defendant was placed on the shore. However, this testimony was contradicted by the victim's rescuer who testified that the victim indicated he had been "rolled out of the boat." This witness, as well as rescue and medical personnel, testified that the victim was cold and wet when found. The defendant himself noted that after stabbing the victim and then "help[ing]" him, the defendant and his companion went through the victim's pockets and took his wallet and keys. The defendant further confessed that he told the victim that help would be sent, but the defendant never took steps to fulfill this promise. The evidence indicated the defendant could have told the wildlife officer, who stopped the defendant's boat moments after the victim had been unloaded, about the victim. The defendant stated, however, "I didn't think about telling [the officer] what happened unless he would of—if he had detained me, yea I would have told him what happened, but I was hoping that he would let me go." The defendant went on to indicate that both he and his accomplice intended to call for help, but neither availed himself of the myriad of opportunities their movements furnished. The defendant could have telephoned "911" anonymously from a pay phone they passed along the road or from telephones in his accomplice's house or in the victim's house. Instead, the defendant left the victim to suffer for some ten hours before he was rescued. *State v. Barfield,* 298 N.C. 306, 259 S.E.2d 510 (1979), *cert. denied,* 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied,* 448 U.S. 918, 65 L. Ed. 2d 1181 (1980) (defendant saw her victim suffering and took no action to save him); *cf., State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983) (defendant immediately sought help after shooting victim). The duration of the victim's suffering has been found to be significant. *E.g., State v. Artis,* 325 N.C. 278, 384 S.E.2d 470 (1989), *sentence vacated,* 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand,* 329 N.C. 679, 406 S.E.2d 827 (1991); *see State v. Brown,* 315 N.C. 40, 337 S.E.2d 808 (1985), *cert. denied,* 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *overruled on other grounds,* 321 N.C. 570, 364 S.E.2d 373 (1988). With the victim marooned, the defendant and his accomplice proceeded to the victim's home, used his keys to enter, stole two guns and some beer, then headed for Georgia. While the defendant surrendered himself to the authorities and cooperated fully, he did so a week after the murder, and only after being informed that the victim, prior to his death, had identified the defendant by name and that police were looking for

him. Evidence at trial indicated that the wounds suffered by the victim need not have been fatal. The victim died some fifteen hours after the attack and roughly five hours after his rescue as the result of blood loss. Though the defendant indicated in his confession that he regretted his action, it is noteworthy that no member of the jury found mitigating value in the defendant's purported remorse. The evidence introduced at trial indicated the defendant had an extensive record of past criminal activity including an armed robbery on a military installation at Fort Sill, Oklahoma in 1986 for which the defendant was sentenced to five years in a Federal Correctional Institution. As noted previously, the defendant confessed that the instant robbery was planned in order to obtain funds and a vehicle in order to flee the state and to avoid the consequences of other criminal activities.

The jury found as aggravating circumstances that: (1) the defendant had been previously convicted of a felony involving the use or threat of violence to the person; and (2) the capital felony was committed for pecuniary gain.

Twenty-three mitigating circumstances were submitted to the jury, but jurors found only eight. The eight found by one or more jurors were: (1) that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, N.C.G.S. § 15A-2000(f)(6); (2) the defendant has acknowledged his guilt to law enforcement officers; (3) the defendant took responsibility for the killing and did not try to minimize his culpability in the murder in his confession; (4) the defendant's confession was consistent with the evidence uncovered by the sheriff's department in the course of their investigation; (5) after the arrest, the defendant, freely and knowingly waived his constitutional right to remain silent and to have an attorney; (6) the defendant is a product of a dysfunctional home environment; (7) the defendant experienced repeated violence in the form of verbal abuse, physical abuse and emotional abuse during childhood; (8) the defendant suffered from continual alcohol and drug abuse from an early age. The defendant offered extensive evidence regarding his childhood and upbringing, in part asserting that frequent moves and a lack of love and nurturing mitigated his actions in this case. We would note that while there was evidence of abuse and neglect, there was also ample evidence to indicate the defendant's mother, brother and other relatives made every effort to provide loving guidance and to help him overcome his drug and alcohol problems. In response to his brother's effort to give the defendant a fresh start after undergoing

drug rehabilitation, the defendant waited until his brother and sister-in-law left for work, then according to the brother, "[m]y TV, VCR, rent money, albums, the tapes, and everything was gone out of my apartment." The defendant was found in the apartment "cracked out" and holding a crack pipe. Evidence showed that the frequent moves were the result of the defendant's stepfather's military commitment and the number and frequency of the moves does not appear excessive. We find there was sufficient evidence for the jury to conclude the nonstatutory mitigating circumstances not found lacked mitigating value.

The defendant offered a proportionality review in his brief. In this review, the defendant sets forth twelve cases for comparison. He contends these cases, which resulted in life sentences, are substantially similar to the instant case and therefore, this Court should find the death penalty in the instant case disproportionate and impose a sentence of life imprisonment.

The first three cases cited by the defendant are cases in which the death penalty was found disproportionate. In *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985), the defendant, age nineteen, was one of three men who decided, after an evening of drinking, to go to the victim's house to buy more liquor. The defendant suggested that they rob and kill the man instead. Following the plan, the three men gained entrance by indicating they were there to purchase liquor. Once inside the house, the defendant pulled a knife and stabbed the victim twice in the chest. When the victim managed to remove the knife, another of the attackers stabbed the victim five or six times in the back. The defendant and his cohorts then searched the house and stole numerous valuables. Medical evidence indicated the victim died shortly after being stabbed as a result of one wound which pierced the heart. Two key factors distinguish the instant case. In *Young*, the aggravating circumstances were limited to those involving the crime at hand—that is, the defendant committed the murder for pecuniary gain and while engaged in the commission of armed robbery. In the case at bar, the jury did not find the mitigating circumstance of the defendant's age and found the aggravating circumstance that the defendant had previously committed a violent felony.

In *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983), the victim was robbed, then shot twice in the head at close range. This Court indicated that there was no evidence of the events after the defendant and victim were seen leaving together. The sole aggravating cir-

cumstance was that the murder was committed for pecuniary gain. The jury found in mitigation that the defendant had no significant history of prior criminal activity and the statutory catch-all. The aggravating circumstance of the present defendant's having committed a prior violent felony distinguishes this case from the case at bar.

The defendant next cites *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987), in which this Court found the death sentence to be disproportionate. In *Stokes*, the defendant and others decided to rob the owner of a warehouse. The owner, age 70, was attacked as he left his business. The defendant was one of two assailants who actually administered blows to the victim with sticks they had carried for that purpose. They robbed the victim and left him lying on the ramp where the assault occurred. He died some fourteen hours after the assault as a result of head injuries including a fractured skull. The co-assailant, Murray, received a life sentence for his role in the assault (*see State v. Murray*, 310 N.C. 541, 313 S.E.2d 523 (1984), *overruled on other grounds by State v. White*, 322 N.C. 506, 518, 369 S.E.2d 813, 819 (1988)). Stokes was found guilty under the felony murder theory. The sentencing jury found the aggravating circumstance that the crime was especially heinous, atrocious, or cruel. The jury also found the presence of mitigating circumstances without specifying what they were. In *State v. Lawson*, we held that, "[s]ince the jury did not specify which mitigating circumstances it found and specified that it found 'one or more,' we must assume for purposes of proportionality review that the jury found both mitigating circumstances submitted. . . ." *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985). We reaffirmed that holding in *Stokes*, where twelve mitigating circumstances were submitted. In distinguishing *Stokes* from the instant case, we note that Stokes was only seventeen-years-old at the time he committed the murder, that he had no significant history of criminal activity, and that he committed the crime while under the influence of mental or emotional disorder. Further, he was not convicted under the theory of premeditation and deliberation. As the Court in *Stokes* noted, the aforementioned combination of circumstances found in robbery cases have generally resulted in life sentences.

In *State v. Holland*, 318 N.C. 602, 350 S.E.2d 56 (1986), *overruled on other grounds by State v. Childress*, 321 N.C. 226, 362 S.E.2d 263 (1987), the victim was found nude, lying on the floor in the bedroom of his house. He had been stabbed numerous times in his chest. Valuables and the victim's car were missing from the house. The defend-

ant had been involved in a homosexual relationship with the victim. At trial, the defendant was found guilty under the theory of premeditation and deliberation. The jury did not find the defendant guilty of felony murder. Two aggravating circumstances were found, that the murder was committed while the defendant was engaged in committing robbery with a dangerous weapon and that the murder was committed for pecuniary gain. However, this Court subsequently vacated the underlying conviction for robbery with a dangerous weapon. The jury also found two mitigating circumstances, that the defendant did not resist arrest and that he had been abused by his father. The absence of a prior conviction of a violent felony is a significant distinguishing factor between *Holland* and the case at bar.

*State v. Wilson*, 311 N.C. 117, 316 S.E.2d 46 (1984), is the next case upon which the defendant relies. The evidence in that case showed that the defendant was dropped off at the victim's residence so that he could inquire about possible employment. When picked up approximately thirty minutes later, the defendant was armed with a .22-caliber pistol and in possession of money and jewelry. He stated that he had killed "old man Teel." The victim, Mr. Teel, was found dead in his home. He had one gunshot wound in the head and four in the chest and upper abdomen. He died as a result of multiple gunshot wounds. Both premeditation and deliberation and felony murder were submitted to the jury, but they returned a verdict based solely upon felony murder and specifically rejected premeditation and deliberation. In reaching a decision on sentencing, the jury found the same two aggravating circumstances as were found in the instant case: (1) that the defendant had previously been convicted of a felony involving the use of violence to the person; and (2) that the murder was for pecuniary gain. The jury also found two statutory and seven nonstatutory mitigating circumstances. In answer to whether the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt, the jury answered "no." A sentence of life imprisonment was then imposed. In distinguishing *Wilson* from the instant case, we would note the jury in this case found the defendant guilty on both theories of murder and also that the jury found only one statutory mitigating circumstance and found that the aggravating circumstances outweighed those in mitigation.

In *State v. Whisenant*, 308 N.C. 791, 303 S.E.2d 784 (1983), the defendant was convicted in the first-degree murder of a 79-year-old man and his 66-year-old female housekeeper. Each victim was found to have died from a single gunshot wound to the back of the head. The

jury found the defendant guilty of first-degree murder based on both premeditation and deliberation and felony murder. The jury was unable to reach a unanimous verdict regarding sentencing, so as required by N.C.G.S. § 15A-2000(b) (1988), the court imposed a life sentence.

*State v. Hunt*, 305 N.C. 238, 287 S.E.2d 818 (1982), upon which the defendant relies, involves the death of Walter Ray, a man known to run an illegal whiskey house and to keep large sums of cash. The defendant had been to Ray's trailer before and had expressed an intent to "rip off" Ray. In an effort to get cash, the defendant, wearing gloves, entered Ray's trailer and grabbed him from behind. He forced Ray into a bedroom where the defendant pocketed approximately $400 in cash and a pistol. He then threatened Ray with the pistol. After Ray pleaded for the defendant not to kill him that way, the defendant permitted the victim to drink alcohol and take some pills. Once the victim became sluggish, the defendant used a knife to inflict wounds on the victim's forearms in the vicinity of his wrist. He later deepened the wounds and waited while the victim bled to death. Investigating officers first believed the wounds were self-inflicted. Later, the defendant spoke with a friend and gave a detailed recounting of the murder. Several months later, the friend informed authorities who arrested the defendant based on this information. As the State notes, the details of this crime are very similar to the case at bar, the jury found three aggravating circumstances including: (1) the defendant had been previously convicted of a felony involving the use of violence to the person; (2) the murder was committed for the purpose of avoiding a lawful arrest; and (3) the murder was committed while the defendant was engaged in the commission of a dangerous felony, to wit, robbery with a dangerous weapon. The jury did not reach the issue of mitigating circumstances, because it was determined by the jury that they could not unanimously find beyond a reasonable doubt that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty.

In *State v. Murray*, 310 N.C. 541, 313 S.E.2d 523, the companion case to *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653, the defendant received a life sentence upon a jury finding that he was guilty of murder under the felony murder theory. While the jury found the same aggravating circumstances as were found in the instant case, the absence of premeditation and deliberation is of importance in comparing the two cases.

## STATE v. HARRIS

[338 N.C. 129 (1994)]

The defendant next argues *State v. Bare,* 309 N.C. 122, 305 S.E.2d 513 (1983), is a comparable case. In *Bare,* the victim was thrown down a mine shaft two different times and the second time rocks were thrown in after him to ensure that he fell all the way to the bottom. The motive in *Bare* was revenge. The defendant was found guilty of first-degree murder on the basis of premeditation and deliberation. The jury found three aggravating circumstances: (1) that the defendant had previously been convicted of a felony involving the use of violence to the person; (2) that the capital felony was committed while the defendant was engaged in the commission of a kidnapping; and (3) that the murder was especially heinous, atrocious, or cruel. A life sentence resulted from the jury's inability to unanimously find beyond a reasonable doubt that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty.

In *State v. Prevette,* 317 N.C. 148, 345 S.E.2d 159 (1986), the victim, age 61, suffocated after being bound by the defendant. The victim was discovered in her home. She was nude and her ankles, knees, wrists, and mouth were bound by various materials. The medical examiner concluded that the victim most likely died as a result of suffocation caused by the gag tied around her mouth. Indications were that the victim was suffering from a sinus infection which made it impossible for her to breathe through her nose. Complications related to the sinus infection caused the cloth gag to form a virtually air tight seal on her mouth. Death most likely occurred within thirty minutes of the gag's being placed across the victim's mouth. The defendant met the victim while he was in prison through the victim's involvement with the Yoke Fellows, a religious organization which conducted Bible studies and held devotionals with inmates. The defendant was found guilty of first-degree murder on the basis of premeditation and deliberation as well as the felony murder rule. The jury found two of the three aggravating circumstances which were submitted: (1) the defendant had been previously convicted of a felony involving the use or threat of violence to the person; and (2) the murder was committed while the defendant was engaged in the commission of kidnapping. The jury found none of the ten mitigating circumstances submitted, but unanimously recommended the defendant be sentenced to life imprisonment.

The defendant also relies on *State v. Wilson,* 313 N.C. 516, 330 S.E.2d 450 (1985), in which the defendant was convicted of first-degree murder based on felony murder. The victim was the manager of the Bishop Motel in Belmont. He was stabbed once in the chest, a

wound which punctured his heart resulting in his bleeding to death. The jury determined that the defendant was present and participated in the killing with others, but did not find that he delivered the fatal blow; intended that the victim be killed; or contemplated that deadly force might be used in the course of the robbery with a dangerous weapon. Five mitigating circumstances were found to exist including: (1) that the defendant is the father of two minor children and is obligated to support them to the best of his abilities; (2) that the defendant, based upon his level of education and work experience, is capable of rehabilitation; (3) that the defendant has members of his family who are willing to assist in his rehabilitation; (4) that the defendant has manifested his concern for his fellow man in providing unsolicited assistance to Donald Isley, who was in need right after a tragedy altered Mr. Isley's life; and (5) that while the defendant has been convicted of a prior felony involving the use of violence, his involvement contained an element of self-defense. While the jury determined that the mitigating circumstances were insufficient to outweigh the aggravating circumstances, it also found that the aggravating circumstances were not sufficiently substantial to call for the imposition of the death penalty.

The final case brought forward by the defendant is *State v. Williams*, 315 N.C. 310, 338 S.E.2d 75 (1986). In *Williams*, the defendant was the boyfriend of the victim's daughter. The victim and her daughter had a history of violent physical confrontations. During the period preceding the murder, the defendant and his girlfriend had discussed "getting rid" of the victim. After a violent argument, the daughter called and spoke with the defendant and expressed the sentiment that she just wished he would "do it." The victim's house evidenced a struggle. She died as the result of ligature strangulation and an acute head injury. The defendant admitted his guilt to his girlfriend, but at trial presented evidence suggesting the victim's daughter was the murderer. The defendant was convicted of first-degree murder. The jury determined that the defendant had previously been convicted of a felony involving the use or threat of violence to the person, and that the murder was committed for pecuniary gain. The jury was presented with four mitigating circumstances and determined that one or more had mitigating value. In the absence of specifically denoted mitigating circumstances, we must find that the jury determined all four had mitigating value. *Lawson*, 310 N.C. at 648, 314 S.E.2d at 503. The jury ultimately determined that, while the aggravating circumstances were not outweighed by the mitigating circumstances, they were not sufficiently substantial to call for the imposition of the death penalty.

**STATE v. HARRIS**

[338 N.C. 129 (1994)]

We held recently:

> [T]he fact that in one or more cases factually similar to the one under review a jury or juries have recommended life imprisonment is not determinative, standing alone, on the issue of whether the death penalty is disproportionate in the case under review. Early in the process of developing our methods for proportionality review, we indicated that similarity of cases, no matter how many factors are compared, will not be allowed to "become the last word on the subject of proportionality rather than serving as an initial point of inquiry." [*State v. Williams*, 308 N.C. 47, 80-81, 301 S.E.2d 335, 356 (1983).] Instead, we stated plainly that the constitutional requirement of "individualized consideration" as to proportionality could only be served if the issue of whether the death penalty was disproportionate in a particular case ultimately rested upon the "experienced judgments" of the members of this Court, rather than upon mere numerical comparisons of aggravators, mitigators and other circumstances. Further, the fact that one, two, or several juries have returned recommendations of life imprisonment in cases similar to the one under review does not automatically establish that juries have "consistently" returned life sentences . . . .

*State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 46-47 (1994).

We have noted in the past that conviction upon both premeditation and deliberation and felony murder theories is significant. *State v. Artis*, 325 N.C. 278, 384 S.E.2d 470 (1989), *sentence vacated*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991). In particular, a finding of premeditation and deliberation indicates "a more calculated and cold-blooded crime." *State v. Lee*, 335 N.C. 244, 297, 439 S.E.2d 547, 575, *cert. denied*, ___ U.S. ___, 130 L. Ed. 2d 162, 63 U.S.L.W. 3264 (3 October 1994) (*citing Artis*, 325 N.C. 278, 384 S.E.2d 470). The State notes in its brief that the jury's finding of the prior conviction of a violent felony aggravating circumstance is significant in finding a death sentence proportionate. *See e.g., Artis*, 325 N.C. 278, 384 S.E.2d 470; *State v. Brown*, 320 N.C. at 214, 358 S.E.2d at 24. We agree. Recently, in *State v. Rose*, 335 N.C. 301, 351, 439 S.E.2d 518, 546, *cert. denied*, ___ U.S. ___, 129 L. Ed. 2d 883, 62 U.S.L.W. 3861 (27 June 1994), we determined that none of the cases in which the death sentence was determined by this Court to be disproportionate have included this aggravating circumstance.

We have not been able to find a case on "all fours" with this case. In examining the cases in the proportionality pool, we believe that if a murder is committed in a particularly egregious manner the jury is likely to return a recommendation that the death penalty be imposed. If on occasion a jury does not do so, that does not mean jurors are not regularly recommending the death penalty in cases which are similar in their cruelty.

The murder in this case was especially callous and cruel. The victim was stabbed, robbed, and thrown overboard while still alive. He was able to reach a pile of oyster shells where he stayed for several hours before he was found. The defendant might have been able to save the victim if he had availed himself of any one of the chances he had to do so after he had left him in the water. Not to do so was particularly cruel. When the nature of the murder is considered in combination with the defendant's past record, we cannot hold that the death sentence was disproportionate.

NO ERROR.

Chief Justice EXUM concurring in part and dissenting in part.

I concur in the result reached by the majority on the guilt phase of this case. However, given the manner in which the crime was committed, defendant's subsequent conduct, our precedents holding that death sentences under similar circumstances are disproportionate, the compelling mitigating circumstances found by the jury and that juries in this State have consistently returned life sentences under similar circumstances, I conclude the death penalty here as a matter of law is disproportionate.

N.C.G.S. § 15A-2000(d)(2) mandates that we consider whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." This requires a comparison of "the case at bar with other cases in the [proportionality] pool[1] which are roughly similar with regard to the crime and the defendant, such as, for example, the manner in which the crime was committed and the defendant's character, background, and physical and mental condition." *State v. Lawson,* 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied,* 471 U.S.

---

1. For a definition of those cases in the proportionality pool, *see State v. Bacon,* 337 N.C. 66, 446 S.E.2d 542 (1994).

1120, 86 L. Ed. 2d 267 (1985). A comparison of this case to other capitally tried cases in our proportionality pool in which both crimes and defendants are similar to the crime and defendant in the instant case compels the conclusion that the sentence of death here is disproportionate.

The State offered in evidence defendant's out-of-court confession to investigators. It offered an edited version during the guilt proceeding and an unedited version during the sentencing proceeding. According to the unedited version of defendant's confession, defendant and Joe Simpson, his accomplice, both worked for the deceased, John Redd, a shrimper. For about a week they had been talking about stealing Redd's truck so they could go to Georgia. On the day of the murder, defendant and Simpson had been drinking. They planned to rob Redd while the three of them were shrimping. While shrimping, defendant and Simpson "dropped the net wrong. . . . It was tangled up. John [Redd] . . . got upset about it and he kept yelling at us. . . . Then he started hounding Joe, saying you are just a piece of shit, I'd rather have Ida working for me. . . . [W]e never did plan to kill him. We did plan to rob him. What happened I don't know. I guess I got tired of his griping and I stabbed the man. I thought I only stabbed him twice, but after I stabbed him, we made him lay down in the boat. He laid down in the boat and he asked me did he have his liquor, so I gave him his liquor and I lit him a cigarette." Defendant and Simpson decided to take the deceased to a beach; "but we got stuck, the boat motor stuck in the sand and we had to drag that out, but when we got there, Joe helped the man off the boat. I told the man that I would call somebody and try to send somebody to him to help him. . . . We weren't going to throw him overboard. We was going to tie him up and put him on the bank. Then take his truck. . . . When I put him down in the boat . . . I asked him, are you all right. He said boys I am hurting, don't stick me again, don't kill me. I said John I am not going to kill you, I am going to get you some help. John, I reckon he thought we was taking him to the dock, because when we pulled up to the bank, I said O.K. John we're here. He looked up, put his hand on the side of the boat, and said we are at the dock? He looked up and he goes oh no don't do that. That's when Joe helped him out of the boat and put him on the bank. . . . I kept telling Joe I think I killed the man. Joe kept saying we need to call somebody and tell them where he was at. We never called anybody. Joe never called anybody. I never called anybody." Defendant, when asked how he felt "inside," replied, "Bad."

STATE v. HARRIS

[338 N.C. 129 (1994)]

This incident occurred shortly before 2:00 a.m. on 21 August 1991. Norwood Mercer, a fisherman, discovered Redd alive at about 6:00 a.m. apparently on or near the bank where defendant and Simpson had left him. Redd told Mercer that he had been robbed and stabbed and had been there "the biggest part of the night." Redd was sitting on a pile of oyster shells at the edge of the water.

Mercer got back to Shell Rock Landing with Redd at approximately 6:30 a.m. and the rescue squad arrived fifteen to twenty minutes later. A paramedic noticed that Redd was pale, cold and wet. He saw two stab wounds on Redd's back. The ambulance arrived at Naval Hospital at Camp Lejeune at 7:22 a.m. Detective Lee Stevens arrived at 7:45 a.m. and spoke to Redd. Redd told Stevens that two persons whom he had hired two weeks ago had accosted him and that defendant had stabbed him and robbed him. Redd said that his assailants had planned it but that the knife with which he was stabbed belonged to him. He said defendant stabbed him twice and that "they threw me overboard." Redd stated that defendant said he would not kill him.

Redd was taken to the operating room at about 10:20 a.m. Dr. David Geiger, a surgeon, was called in and observed three stab wounds in Redd's back. Redd died at 12:46 p.m. on 21 August 1991 because of blood loss from the stab wounds.

Although defendant was convicted on the basis of both premeditation and deliberation and felony murder, the underlying felony being armed robbery, there is barely enough evidence in the guilt phase to carry the question of premeditation and deliberation to the jury. The fatal stabbing was not planned but took place on the spur of the moment. While there is evidence that defendant intended to kill Redd when he stabbed him, the evidence also shows that, after the stabbing occurred, defendant and Simpson took measures which they thought might save Redd's life. They assisted Redd after the stabbing and left him alive in a place where he might be rescued. Redd was, in fact, rescued alive, and he lived for almost twenty-four hours after defendant stabbed him.

Defendant voluntarily surrendered himself and gave a full confession to law enforcement authorities. His confession was the principal evidence against him at trial. Defendant showed some remorse in his confession; although the jury did not find this to be a mitigating circumstance.

**STATE v. HARRIS**

[338 N.C. 129 (1994)]

At sentencing, the jury found two aggravating circumstances—that defendant had been previously convicted of a felony involving the use or threat of violence to the person and that the capital felony was committed for pecuniary gain. It also found the statutory mitigating circumstance that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. The jury found seven nonstatutory mitigating circumstances: Defendant has acknowledged his guilt to law enforcement officers; defendant took responsibility for the killing and did not try to minimize his culpability; defendant's confession was consistent with the evidence uncovered by the sheriff's department in the course of its investigation; after the arrest, defendant freely and knowingly waived his constitutional right to remain silent and to have an attorney; defendant is a product of a dysfunctional home environment; defendant experienced repeated violence in the form of verbal abuse, physical abuse and emotional abuse during childhood; and defendant suffered from continual alcohol and drug abuse from an early age.

These circumstances, of course, do not justify defendant's having inflicted the fatal wounds; and defendant should be severely punished by being imprisoned for life for the murder he committed. They do, I believe, show that this murder does not rise to the level of egregiousness present in those cases in which juries have returned, and we have affirmed, death sentences. Considering both the crime and the defendant, this case is more like murder cases in which life imprisonment has been imposed.

There are several cases in the proportionality pool, similar to the one before us, in which this Court concluded the death penalty was disproportionate:

In *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985), the defendant and two companions went to the victim's home to both rob and murder him. Because the victim knew the defendant and his companions, they were allowed into the home under the guise that they were going to buy some liquor. The defendant surprised the victim and stabbed him twice. A companion "finish[ed] him" by stabbing him five or six more times. After the killing, the defendant along with the others stole valuables from the victim. They then searched his house and stole his coin collection. The jury in *Young* found two aggravating circumstances, that the murder was committed while defendant

was engaged in the commission of an armed robbery and that it was committed for pecuniary gain.

The robbery and murder in *Young* are similar to the robbery and murder in this case in that in both cases alcohol was a factor, defendants took advantage of their familiarity with the victims, and stabbing was the means by which the killings were committed. Indeed, the killing in *Young* was more aggravated because it was planned in advance and some of the wounds were inflicted after the victim was rendered helpless. Here defendant only planned to rob the victim. It was only after an argument and the consumption of alcohol that the robbery escalated into murder. Defendant also made some attempt to assist the victim after the stabbing.

In *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983), another similar robbery murder case, three men conspired to rob an elderly man. The defendant tricked the victim into giving him a ride and then shot him twice in the head during the course of the robbery. The jury found as an aggravating circumstance that the killing was committed for pecuniary gain. The Court found the death sentence imposed on Jackson was disproportionate.

In *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), the victim died of a cardiac arrest after being robbed and shot in the legs by the defendant. The jury found the aggravating circumstance that the crime was committed for pecuniary gain. In determining that the death sentence was disproportionate, the Court noted that it appeared defendant was simply attempting to rob the victim. Defendant pleaded guilty during the trial and acknowledged his wrongdoing before the jury. Likewise in this case, I believe the evidence shows that defendant only planned to rob the victim. He turned himself in to the authorities and took responsibility for his actions.

There are several robbery murder cases in which juries, after finding the same two aggravating circumstances as those found here, have recommended life imprisonment. *State v. Howard*, 334 N.C. 602, 433 S.E.2d 742 (1993); *State v. Erlewine*, 328 N.C. 626, 403 S.E.2d 280 (1991); *State v. Darden*, 323 N.C. 356, 372 S.E.2d 539 (1988); *State v. Clark*, 319 N.C. 215, 353 S.E.2d 205 (1987); *State v. Williams*, 315 N.C. 310, 338 S.E.2d 75 (1986); *State v. Wilson*, 311 N.C. 117, 316 S.E.2d 46 (1984); and *State v. Murray*, 310 N.C. 541, 313 S.E.2d 523 (1984), *overruled on other grounds by State v. White*, 322 N.C. 506, 369 S.E.2d 813 (1988).

**STATE v. HARRIS**

[338 N.C. 129 (1994)]

In *State v. Holland*, 318 N.C. 602, 350 S.E.2d 56 (1986), *overruled on other grounds by State v. Childress*, 321 N.C. 226, 362 S.E.2d 263 (1987), defendant stabbed the victim to death, and the jury found two aggravating circumstances: the murder was committed while the defendant was engaged in committing robbery with a dangerous weapon and the murder was committed for pecuniary gain. The jury recommended life imprisonment.

It thus appears that in cases where both the crime and the defendant are similar to the crime and the defendant here either this Court has declared the death penalty to be disproportionate or juries have returned sentences of life imprisonment. The majority has not cited a similar case in which the death penalty was imposed at trial and affirmed on appeal, and my research has not revealed one.

In *State v. Lawson*, 310 N.C. at 648, 314 S.E.2d at 503, we said that if, after making the comparisons with similar cases, considering both the crimes committed and the defendants who committed them,

> we find that juries have consistently been returning death sentences in the similar cases, then we will have a strong basis for concluding that a death sentence in the case under review is not excessive or disproportionate. On the other hand if we find that juries have consistently been returning life sentences in the similar cases, we will have a strong basis for concluding that a death sentence in the case under review is excessive or disproportionate.

This Court has consistently and recently made these kinds of comparisons in conducting its proportionality reviews in death sentence cases. *See State v. Sexton*, 336 N.C. 321, 444 S.E.2d 879 (1994); *State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994); *State v. Syriani*, 333 N.C. 350, 428 S.E.2d 118 (1993), *cert. denied*, 126 L. Ed. 2d 341, 62 USLW 3319 (U.S.N.C., Nov. 1, 1993) (No. 93-5077), *reh'g denied*, 126 L. Ed. 2d 707, 62 USLW 3453 (U.S.N.C., Jan. 10, 1994) (No. 93-5077); *State v. Hill*, 331 N.C. 387, 417 S.E.2d 765 (1992), *cert. denied*, 122 L. Ed. 2d 684, 61 USLW 3582 (U.S.N.C., Feb. 22, 1993) (No. 92-6594), *reh'g denied*, 123 L. Ed. 2d 503, 61 USLW 3715 (U.S.N.C., Apr. 19, 1993) (No. 92-6594); and *State v. Roper*, 328 N.C. 337, 402 S.E.2d 600 (1991), *cert. denied*, 116 L. Ed. 2d 232, 60 USLW 3266 (U.S.N.C., Oct. 7, 1991) (No. 91-5252).

Considering both the crime and defendant, as we are required to do by N.C.G.S. § 15A-2000(d)(2), and the other cases in our propor-

tionality pool in which both the crime and defendant are similar to the crime and the defendant here, I conclude the sentence of death imposed in this case is disproportionate. I vote to remand the case to the superior court for the imposition of a sentence of life imprisonment.

Justice Frye joins in this concurring and dissenting opinion.